[No. 631. *En Banc.* February 24, 1925.]

*In the Matter of the Proceedings for the Disbarment of*
ELMER S. SMITH.[1]

ATTORNEY AND CLIENT (7) — DISBARMENT — DISLOYAL CONDUCT — EVIDENCE—SUFFICIENCY. The disbarment of an attorney for advocating sabotage, syndicalism and general violation of the law as a means of social reform, is sustained by the evidence, where it appears that such advocation was made in many public addresses under the auspices of the Industrial Workers of the World, whose vile literature teaching sabotage and criminal syndicalism was circulated among his listeners with his knowledge, and passages in his addresses justified theft and larceny (TOLMAN, C. J., and PARKER, J., dissenting).

Proceedings filed in the supreme court May 29, 1923, for the disbarment of an attorney, upon findings of the state board of law examiners against the accused. Judgment of disbarment.

*G. F. Vanderveer,* for accused.

*The Attorney General* and *R. G. Sharpe, Assistant,* for the state.

[1]Reported in 233 Pac. 288.

MACKINTOSH, J.—This is a proceeding for the disbarment of Elmer S. Smith from the practice of law in this state. The substance of the charge against·him is that, in public addresses since 1919, he has advocated and approved sabotage, syndicalism and general violation of the law as a means of social reform. The state board of law examiners, upon the evidence taken before them, have recommended his permanent disbarment, and upon that recommendation the matter is here for determination.

The record abundantly shows that the defendant has both advocated and approved sabotage and criminal syndicalism as a means of accomplishing social and industrial changes in our form of government. In his public addresses, of which he has delivered a great number throughout the state, under the auspices of the organization known as the Industrial Workers of the World, the literature of that organization was circulated among his listeners, which teaches both sabotage and criminal syndicalism as a means of enforcing industrial changes. The defendant could not be, and the evidence shows ·that he was not, unaware of the fact that this was done, and there is no reason why he should not be charged with all the responsibility that usually follows an abettor of a criminal act.

This literature is vile. It advocates many serious crimes as the means of carrying out the purposes of the organization, and ways are pointed out how the acts can be accomplished with the least possibility of detection. Subsequently to the passage by the different states of the so-called criminal syndicalism acts, much of this has not been circulated as openly as it was before, but the evidence shows that the organization has not abandoned the doctrines, and any person who advocates such general principals is unworthy of the office of attorney at law.

But, if the foregoing be thought not sufficiently direct to charge the defendant with knowledge, and thus with direct responsibility, there are other matters in the record sufficient to sustain the findings of the board of examiners. In this state there are acts directed against the teachings and practices such as are advocated by the organization before named. A number of persons have been convicted and are now in confinement for violating the acts. There are also others, members of the organization, in confinement for more heinous crimes. These the defendant has been pleased to denominate "political prisoners," and persons punished because of their opinions, and has in his public addresses advocated a general strike, a strike that "will paralyze all the industries of the state," as a means of coercing their liberation. On his admission to practice as an attorney, the defendant took an oath to uphold the laws of the land, and, in our opinion, his conduct in this particular is a violation of that oath.

There is, moreover, in his addresses a more direct incitement to crime than even the foregoing. In one of his addresses he used this language, which was repeated in varying forms in others:

"There are two animals in this world for which I have a profound admiration. One is the lumberjack and the other is a mule. As between the lumberjack and the mule I think more of the mule. Why? Because a mule is a profound animal, and when he is through with his eight hours of work he is through, and when you try to work him more than eight hours you have a battle. How many people ever saw a mule lie down in a fenced-in yard where there was a fine haystack and a great big box of oats and starve to death? How many of you ever knew him to pull that? How many ever knew a lumberjack to come into a place where there are millions of tons of food stored away and sleep in the street and go hungry? I am a profound admirer of the mule. I repeat it."

This means that larceny and theft are justifiable. The thought is further emphasized by later expressions in the address, wherein he tells his listeners that all property is theirs of right, because they have paid for it "a million times in sweat and bent backs, in poverty-stricken and hard old age."

To show that the principles and doctrines of the organization which the defendant advocates are not overstated, a few excerpts from its literature, copies of which are part of the record, are here set forth. In a song book of the organization is a song entitled "Christians at War," and reads in part as follows:

" Onward, Christian soldiers, rip and tear and smite!
    Let the gentle Jesus bless your dynamite,
    Splinter skulls with shrapnel, fertilize the sod,
    Folks who do not speak your tongue deserve the
        curse of God.
    Smash the doors of every home, pretty maidens
        seize;
    Use your might and sacred right to treat them as you
        please.
" Onward, Christian soldiers! Drench the land with
        gore;
    Mercy is a weakness all the gods abhor.
    Bayonet the babies, jab the mothers too;
    Hoist the cross of Calvary to hallow all you do.
    File your bullets' noses flat, poison every well,
    God decrees your enemies must all go plumb to hell."

Another, under the title of a once popular song, reads:

" I had a job once threshing wheat, worked sixteen
        hours with hands and feet,
    And when the moon was shining bright, they kept
        me working all the night.
    One moon light night, I hate to tell, I 'accidentally'
        slipped and fell,
    My pitchfork went right in between some cog wheels
        of that thresh-machine.

"Chorus.
" Ta-ra-ra-boom-de-ay!
It made a noise that way.
And wheels and bolts and hay
Went flying every way.
That stingy rube said, 'Well,
A thousand gone to hell,'
But I did sleep that night;
I needed it all right.''

" Next day that stingy rube did say, 'I'll bring my eggs to town today;
You grease my wagon up, you mutt, and don't forget to screw the nut.'
I greased his wagon all right, but I plumb forgot to screw the nut,
And when he started on that trip, the wheel slipped off and broke his hip.''

Still another, entitled, "Casey Jones—The Union Scab," contains this verse:

" The Workers said to Casey; 'Won't you help us win this strike?'
But Casey said: 'Let me alone, you'd better take a hike.'
Then someone put a bunch of railroad ties across the track
And Casey hit the river with an awful crack.''

Concerning sabotage, there is in a pamphlet entitled "The New Unionism" the following:

"Direct action may assume two different forms; either the workers will stop working altogether or they will perform work under conditions detrimental to their employers. In the first case they will strike, in the second they will apply sabotage.

"New Unionist strikes are mere incidents in the class war; they are tests of strength, periodical drills in the course of which the workers train themselves for concerted action. This training is most necessary to prepare the masses for the final 'catastrophe', the general strike, which will complete the expropriation of the employers.

"Besides the strike which is direct action in mass, the workers have at their command an insidious means of individual warfare which, owing to its very nature, entails less important sacrifices on their part, and is at times fully as effective as the strike. We allude to sabotage.

"We may distinguish three forms of sabotage:

"1. Active sabotage which consists in the damaging of goods or machinery.

"2. Open-mouthed sabotage beneficial to the ultimate consumer and which consists in exposing or defeating fraudulent commercial practices.

"3. Obstructionism or passive sabotage which consists in carrying out orders literally, regardless of consequences.

"On the subject of violent sabotage we read in the Bulletin of the Montpellier Labor Exchange for 1900:

" 'If you are an engineer you can with two cents worth of powdered stone or a pinch of sand stall your machine, cause a loss of time and make expensive repairs necessary. If you are a joiner or wood-worker what is simpler than to ruin furniture without your boss noticing it, and thereby drive his customers away? A garment worker can easily spoil a suit or a bolt of cloth; if you are working in a department store a few spots on a fabric cause it to be sold for next to nothing; a grocery clerk by packing up goods carelessly brings about a smash-up; in the woolen or the haberdashery trade a few drops of acid on the goods you are wrapping will make a customer furious, an agricultural laborer may sow bad seed in a wheat field, etc.' "

"As far as sabotage is concerned, all the I. W. W. speakers and the I. W. W. press countenance it, although they steadily warn the workers against the indiscriminate and unsocial use of that weapon of warfare."

In another, entitled "The I. W. W.—Its History, Structure and Methods," the following is found:

"As a revolutionary organization the Industrial Workers of the World aim to use any and all tactics which will get the results sought with the least expendi-

ture of time and energy. The tactics used are determined solely by the power of the organization to make good in their use. The question of 'right' and 'wrong' does not concern us. . . .

"Failing to force concessions from the employers by the strike, work is resumed and 'sabotage' is used to force the employers to concede the demands of the workers.

"The great progress made in machine production results in an ever increasing army of the unemployed. To counteract this the Industrial Workers of the World aim to establish the shorter work day and to slow up the working pace, thus compelling the employment of more and more workers.

"During strikes the works are closely picketed and every effort made to keep the employers from getting workers into the shops. All supplies are cut off from strike bound shops. All shipments are refused or missent, delayed and lost if possible. Strike breakers are also isolated to the full extent of the power of the organization. Interference by the government is resented by open violation of the government's orders, going to jail en masse, causing expense to the taxpayers—which is but another name for the employing class.

"In short, the I. W. W. advocates the use of militant 'direct action' tactics to the full extent of our power to make good."

In still another pamphlet is this:

"What then is Sabotage?

"Sabotage is the destruction of profits to gain a definite revolutionary economic end. It has many forms. It may mean the damaging of raw materials, destined for a scab factory or shop. It may mean the spoiling of a finished product. It may mean the displacement of parts of machinery or the disarrangement of a whole machine where that machine is the one upon which the other machines are dependent for material. It may mean working slow. It may mean poor work. It may mean missending packages, giving overweight to cus-

tomers, pointing out defects in goods, using the best of materials where the employer desires adulteration and also the telling of trade secrets. In fact, it has as many variations as there are different lines of work.

"Sabotage is a direct application of the idea that property has no rights that its creators are bound to respect.

"The question is not, 'Is sabotage immoral, but, Does sabotage get the goods.'

"In advocating sabotage we hope to show that the workers should rid their minds of the last remnant of bourgeois cant and hypocrisy and by its use develop courage and individual initiative.

"In the social war sabotage is the best kind of a flank movement upon our enemy—the employing class. An actual instance will serve to illustrate the point:

"On an orchard farm in the state of Washington a disagreement arose over conditions on the job. A strike took place. The I. W. W. members among the strikers immediately telephoned to the union in the nearest city. When the employer arrived in town looking for a new crew he was rather surprised at his speedy success. Full fare was paid for the men and the railway train was boarded. At the first stop, about two miles from the city, the whole crew deserted the train. They were all members of the union. Returning to the city the farmer picked up a second crew. He arranged to have them pay their own fare, same to be refunded upon their arrival on the farm. This crew went through all right and worked for a while under the farmer's direction. Thinking the strike was successfully broken, the employer finally busied himself with other matters for the rest of the day. Next morning upon visiting the work the farmer was surprised to find that 1,000 young trees had been planted upside down, their roots waving to the breeze as a mute evidence of solidarity and sabotage. No further argument was needed to convince the farmer of the 'justice' of the demands of the original crew.

"Sabotage may mean the direct destruction of property. Again, it may mean indirect destruction through organized inefficiency."

Much more of a similar character could be cited, but this should be enough to sustain the assertion that the organization named advocates the uses of criminal means for the accomplishment of its objects and purposes. It is said that these were the earlier ideas of the organization, were "doctrines which it may have preached but never practiced," and that its later pronouncements condemn such doctrines. But in a pamphlet of the organization published as late as the year 1923, the statement is made that "the early ideas of the I. W. W. have not changed," and one has but to consult our own cases and to review recent local state history to find instances wherein certain of the doctrines here taught have been put into practice.

The defendant is freely conceded the right to advocate, either publicly or privately, changes in the present form of government, however great or however fundamental such changes may be, so long as his advocacy is confined to means sanctioned by law. But he oversteps permissible bounds when he advocates changes by criminal or other unlawful means, and this the evidence demonstrates he has done, both directly and indirectly.

The findings of the board of examiners recommending the disbarment of the defendant should be, and are, approved and an order of disbarment entered.

FULLERTON, MAIN, BRIDGES, MITCHELL, and HOLCOMB, JJ., concur.

PARKER, J. (dissenting)—I cannot read in this record any language ever spoken by Smith conveying such sinister meaning as my brethren joining in the majority opinion see therein. Smith is not a member of the Industrial Workers of the World. True, he spoke at meetings held under the auspices of members of that

organization. Whether or not such meetings were officially authorized by the organization, or any branch thereof, is not rendered at all clear to my mind. I look in vain in this record for any clear and certain evidence that Smith has advocated the views expressed in the quotations from the so-called I. W. W. literature introduced in evidence in this case, in so far as they may be considered as advocating sabotage, syndicalism or actual violations of law. Nor can I agree that the record shows with certainty that Smith distributed, or is responsible for the distribution, of any of the literature introduced in evidence in this case and mentioned in the majority opinion. Some of the utterances of Smith may seem capable of being construed as in substance advocating crime, looking to the bringing about of social changes he seems to favor, but to my mind such construction of his utterances would have to be the result of uncertain inferences to be drawn from language used by him. For these reasons, I dissent.

TOLMAN, C. J., concurs with PARKER, J.