## J. CARL LAMBDIN v. STATE OF FLORIDA

9 So. (2nd) 192                En Banc
June 16, 1942          Rehearing Denied July 31, 1942

Erle B. Askew, L. P. Hardee and B. K. Roberts, for appellant.

J. Tom Watson, Attorney General, Millard B. Conklin, Assistant Attorney General, Woodrow M. Melvin, Special Assistant Attorney General, and Victor O. Wehle, Asistant State Attorney, for appellee.

TERRELL, J.:

This is a disbarment proceeding pursuant to Section 4172, Compiled General Laws of 1927. The motion to disbar contained numerous charges of unprofessional conduct and was sworn to on information and belief. A demurrer, a motion to strike and a motion to dismiss were overruled. An answer was filed and on final hearing, the trial court entered an order disbarring defendant. This appeal is from the final decree.

It is first contended that the motion to dismiss should have been granted because the charges were vague, indefinite, and uncertain, that they do not allege moral turpitude and are verified on information and belief.

It appears that the complaint which is the gist of the motion to disbar was filed by the Grievance Committee of the St. Petersburg Bar Association. It was addressed to one of the circuit judges under oath and stated that the contents "are true to the best of affiant's knowledge and belief." On this point, the only requirement of the statute is that the motion to disbar be in writing and in the name of the State. No particular form of verification is required. Under such circumstances, we have held that it does not have to be under oath. Richardson v. State, 141 Fla. 218, 192 So. 876. In Worthen v. State, ex rel. Verner, 189 Ala. 395, 66 So. 686, the Supreme Court of Alabama has approved the like rule affecting a statute almost identical with ours. Other decisions are to like effect.

Questions two to ten inclusive have to do with the specific charges of unprofessional conduct and the evidence supporting them. Summarized, they charge defendant (1) with having falsely advised a client that his claim had been reduced to judgment, execution issued thereon and returned unsatisfied, when in fact the cause was still pending on demurrer; (2) with having secured moneys from a client for court costs and refusing to return the unexpended balance not used for that purpose; (3) with having collected funds for a client and giving bad checks therefor which were made good after great annoyance to client; (4) with having collected funds for a client as the agent of a corresponding attorney and forwarding

said attorney a bad check for the proceeds; (5) with having solicited employment as attorney and having concealed from the one solicited the fact that he was representing another who was his real client; (6) without authority or knowledge of certain judgment creditors of having issued executions for said judgments, levied under them, held sheriff's sale in the name of a dummy corporation and receipted to the sheriff in the name of alleged clients for moneys never received by them from the sale; (7) with having attempted to pervert justice and prevent the fair trial of a divorce suit by dismissing it in one county and later bringing it in another county in order that the service be juggled.

Appellant contends that these charges are not sufficient in that they do not allege fraud or corrupt motives, moral turpitude, or bad faith so reprehensible, disgraceful, and unprincipled as to constitute a criminal act of high degree.

Charges of unprofessional conduct under Section 4172, Compiled General Laws of 1927, may be predicated on "dishonest conduct, or habits of general immorality, or any such single act of crime or vice as may show him to be unfit for the trusts and confidence reposed in him as an attorney, or of deceit or misconduct in his office of attorney, or of suppressing or attempting to supress any testimony in any case, or of tampering with any record, or of stirring up litigation, or being drunk while the case under his charge is being considered in court, or any unprofessional acts which unfit him for association with the fair and honorable members of the profession. . . ." If the charge is comprehended in one or more of the provisions of the statute so quoted and is cast in clear

unambiguous terms, that is sufficient. It is not essential that the certitude required in drawing an indictment to charge a crime be observed.

This is true because of the nature of the lawyer's business and the character of those who engage in it. Practice of the law is an impersonal name applied to the mechanics of administering justice through the medium of judges and lawyers. The administration of justice is a service rendered by the State to the public and exacts of those who engage in it the highest degree of confidence and good faith. No service furnished by the State more vitally affects the public. We practice law by grace, not by right. The privilege to practice law is in no sense proprietary. The State may grant it or refuse it, or it may withdraw it from those who abuse it.

The administration of justice is a composite rather than an individual concept. It is a derivative of Christian ethics and with us has attained a significance that it has no where else on earth. It contemplates the righteous settlement of every controversy that arises affecting the life, liberty, or property of the individual. Lawyers and judges are stewards of the law provided for this purpose. When the law practice leads otherwise than to justice or to social and economic adjustment, it may be generally traced to unfaithful stewardship. "Practice of the law" and "administration of justice" are used interchangeably in this opinion. When the "bar" or "members of the bar" is used, "judges" may be comprehended.

Since the practice of the law deals with the most abiding and the most vital relations of life, we speak of it as a great and honored profession. Mr. Justice BRANDEIS characterized a profession as "an occu-

pation for which the necessary preliminary training is intellectual in character, involving knowledge and to some extent learning as distinguished from mere skill, an ·occupation which is pursued largely for others and not merely for one's self, an occupation in which the amount of financial return is not the accepted measure of success." In fact, the practitioner who makes financial return his main objective will experience little of the real joy that comes to those whose interest in the law rises above the economic.

The administration of justice is the business of the public. Members of the bar are stewards commissioned to perform that business. Their stewardship will be successful in proportion to the manner in which they take the public into their confidence and perform it with a fidelity alike to the State, to client, and to the profession. To the State, faithful stewardship contemplates the exercise of a zeal for justice without regard to race, creed, bloc, or station in life. To client, it contemplates that his cause be dispatched with intelligence and frankness, at the minimum expense, and that every right, defense, equity, inducement, or mitigating circumstance affecting his cause will be courageously advocated to the Court. To his profession, it contemplates an awareness that every breach of professional conduct on his part reflects on the bar as a class, that he will keep sacred his fidelity to his brethren and that in the conduct of his profession, he will do nothing that will reproach the administration of justice.

There must be ethical and professional standards to govern the law practice. It is utter folly to contend that a business which touches the public as vitally as the law practice does may be pursued according to each

lawyer's concept of right and wrong and in disregard of responsibility to the State, to client, and profession. You can no more conceive justice being administered in the absence of rule than you can think of a game of football without rules and an umpire to enforce them. The strength and stability of the bar including the extent to which the public trusts it is determined more often by its moral than by its academic standing. It is not out of place to state that the men who have influenced the bar and the country most have been men of stalwart character rather than men of great learning.

Whatever truth there is to the charge that the public no longer trusts the bar is not due to the fact that a majority have become ethically obtuse. It is due to the fact that an unscrupulous minority are unfaithful stewards, who insist on placing emphasis in the wrong place; too much concern about fees and winning cases and too little concern about administering justice in the way to inspire public confidence. Making a fee is important but it is incidental to doing justice and is not the "accepted measure of success" at the bar. A few lawyers, by reason of ability, sustained industry, and ingenuity, are handsomely remunerated, but the great majority work hard, struggle to keep above the poverty level, and die poor. History tells us that the practice of law was commenced in Rome about B. C. 280, that Coruncanius was the first lawyer to expose his shingle to the elements, that during his time and much later, lawyers were dependent on the voluntary gifts of clients and could not force them to pay. We are convinced that individually the great majority of the bar are deeply sensitive to the trust imposed in them, and enjoy the

confidence of the public, but as a class, the performance of some affords ground for mistrust and the public is prone to take the measure of the class by the conduct of the miscreant.

Public confidence in the bar will return in proportion to the extent it becomes sensitive to its stewardship and makes the administration of justice its major objective; it will not return while the bar condones those who practice guerilla tactics with total abandon of their fidelity to the State and the profession; it will not return while members of the bar permit themselves to be employed for the sole purpose of throwing a shield of protection about those engaged in organized vice; it will not return while members of the bar ignore the factor of public stewardship and are actuated instead by the philosophy of William H. Vanderbilt's cryptic epitome, "The public be damned." It will not return so long as litigation is synonymous with liquidation and a lawsuit is permitted to become an endurance marathon rather than a means to ascertain the truth of the controversy and arrive at a basis for doing justice between the litigants. Nor will it return while the administration of justice jogs along as did Balaam on the back of an ass while every other democratic process travels by twentieth century vehicle.

These considerations serve to explain the place of the lawyer and the responsibility that admission to the bar connotes. They also explain the urge for raising the ethical and academic requirements for admission to the bar. The Constitution also recognizes peculiar qualifications for the bar in that it places them in a class to themselves, authorizes them and no others to represent litigants, and makes admission to

the bar a prerequisite for holding certain offices. Every lawyer is admitted to practice on the strength of a certificate that he has met these requirements. His academic standing may be certified by his preceptor, but his moral character must be vouched for by members of the bar and in addition thereto he may be required to pass an examination on the Code of Ethics. The standard of your milk, your groceries, and your drugs, in fact everything used in the home, is certified in much the same manner. If you find wiggle tails in your milk or cockroaches in your bread, your wife will "fire" the milkman and the grocer quicker than it takes to tell it. If you find adulterated drugs in your cabinet, you prosecute your druggist under the Pure Food and Drugs Act. When you employ a lawyer, you clothe him with a much more important trust than you do your grocer or your druggist. It would indeed be a strange anomaly to hold that he cannot be disbarred if he violates the trust you impose in him.

Because of the repeated occurrence of disbarment cases in this Court, we felt constrained to speak frankly on the situation and raise a standard that every member of the bar would be expected to conform to when embarking in the practice. The bar is by education and training better equipped for leadership in a democracy like ours than any other group. When the public becomes convinced that justice is being administered by it after the pattern here set up, it will be searched for to lead and to transact the business it was designed for. Unless some such standard can be attained, we may expect administrative boards and other agencies to take the place of the courts and the law practice to go the way of old.

dobbin and the family buggy, the hitching post, and the whippng post.

The trial court found defendant to be an unfaithful steward and entered a judgment of disbarment against him. We have examined the record and measured by the standard here proclaimed he could have reached no other judgment. If all lawyers practiced by the methods he pursued, the administration of justice would soon become host for a brood of evils that would disintegrate and destroy it. He appears to have overlooked the element of fidelity to his client, to the court, and the State.

The only other question remaining to be considered is that of the taxation of costs. It is admitted that defendant paid his own costs and one half the cost of the court reporter. The trial court taxed him with the balance of the costs or $438.00.

Appellee contends that a disbarment proceeding is in the nature of a civil case and that the cost should follow the losing party but the rule seems to be that there must be some statutory authority for costs and we find none in this case.

It follows that the final decree is reversed in so far as it imposes costs on appellant but in all other respects it is affirmed.

Affirmed in part; reversed in part.

BROWN, C. J., WHITFIELD, BUFORD, CHAPMAN, THOMAS and ADAMS, JJ., concur.