## IN RE: J. HENRY HARRELL

23 So. (2nd) 92
June Term, 1945
July 10, 1945
Division B
Rehearing denied Sept. 10, 1945.

*J. Henry Harrell* in propria persona, for appellant.

*J. Tom Watson*, Attorney General and *George M. Powell*, Assistant Attorney General, for appellee.

THOMAS, J.:

In this appeal we are asked by J. Henry Harrell, late of the Tallahassee bar, to review an order of the circuit judge entered 23 September 1944 suspending him for a period of fifteen months from his office as attorney.

The record presents a sorry picture of the activities of the attorney in the procurement of a divorce for one Vincent Luther Petenbrink, an army officer, and depicts a course of conduct which is the very antithesis of what is expected of an honorable and conscientious lawyer concerned in presenting properly the cases of his clients, in meriting the confidence of the court, and in earning the respect of the public for himself and his profession. Although there was an attempt to becloud the real issue in the case by means of self-serving statements, hearsay testimony, and refutation to an extreme degree of inconsequential matters, there was abundant evidence to establish rank misbehavior on the part of the atterney.

We shall now give the version of the lawyer's doings in behalf of his client, Petenbrink, as they were related by witnesses whom the court obviously believed, despite denial by appellant of many of, if not all, the main features indicating

his misconduct. He was employed to obtain a divorce from the plaintiff's wife who lived in Cumberland, Maryland. The plaintiff was stationed at Camp Gordon Johnston in Florida, and the suit was instituted in Leon County. On 3 July 1944 Petenbrink appeared at the attorney's office in response to a telegram, apparently for the purpose of recording the testimony which would be presented to the chancellor in support of his bill of complaint. When he reached the attorney's office he was asked if he had any witness, and upon replying that he had none and knew of none in the City of Tallahassee he was instructed by the attorney: " 'Get anybody. It's just a matter of form; you go over there before the Judge and your witness will swear them things is the facts and the Judge will say OKay.' " Petenbrink swore on the witness stand that the attorney well knew his lack of acquaintance with anyone in the community who could testify in his behalf because they "talked it over." Following his counsel's suggestion, Petenbrink went forth in search of a witness and found, on a street of Tallahassee, a soldier, a private, whom he had never seen before, and fetched him to the lawyer's office.

Officer and private had not even seen each other before, and the latter knew nothing whatever about the wife or the marital difficulties of the parties. They went to the appellant's office, where he was busily engaged in drafting the questions and answers which were eventually to constitute the report of a master subsequently to be appointed by the court. In furtherance of their scheme of fabrication it was evidently thought wise not to let the convenient witness' true name appear; so counsel and client entered into a discussion about what name should be assigned him for the occasion and hit upon "Raymond Johnson," the surname having been contributed by the one, the given name by the other. It was long afterward, when the trickery of these parties had been drawn to the attention of the State Attorney and a provost marshal, that the true name of the witness became known to his two fellow-conspirators as Stanley Hrichuk. So then and there for the purposes of the suit a perfect stranger to the circumstances giving rise to the controversy became a material witness, and Stanley Hrichuk became Raymond Johnson; more-

over, Hrichuk, alias Johnson, who had never been in Cumberland, Maryland, and who had appraised the lawyer that he had not, was supplied a residence address there, 1300 Grand Avenue.

When the report of a master not yet appointed had been completed by the appellant he, his client, and the accommodation witness hied themselves to Quincy, in an adjoining county, there to consummate this fraud upon the court. They petitioned the court for the appointment of a lawyer in Quincy to serve as special master, then presented to him the report which the appellant had prepared. When the witnesses had been sworn and had signed their testimony it was returned to the chancellor, who rendered a decree a few days later. When the rule announced in Chisholm v. Chisholm, 98 Fla. 1196, 125 So. 694, is borne in mind it is patent that the plaintiff could not have prevailed without the fabricated testimony, for there was no other evidence to corroborate the plaintiff's story of his wife's misbehavior or to substantiate his claim that he was and had been for the required period a resident of the State of Florida.

This brings us to a digest of the eight brief answers given by the spurious witness. He knew the plaintiff and his wife casually; knew the husband had lived in Florida a year and that the wife had been unfaithful. He "went along with the plaintiff at his request, and saw her with [a] man on the porch." He was related to neither, but was a good friend of the plaintiff. The plaintiff was worried by his wife's actions and could not live with her again "in any satisfaction." So testified Stanley Hrichuk about the ground of divorce and the jurisdictional prerequisite of residence. All this he swore despite his total ignorance of the parties, the lawyer, the controversy; and to cap the fraud he affixed the name by which he had been dubbed by appellant and the plaintiff in the case. Truly it would challenge the imagination to conceive of a more flagrant fraud than these men committed upon the dean of Florida's bench.

Appellant insists that the proof of misconduct on his part had not sufficient clarity to justify his suspension from the bar. He cited to support his position the opinion of this

court in Zachary v. State, 53 Fla. 94, 43 So. 925, but from our study of this case in the light of that decision we do not find the evidence of reprehensible deportment on the part of the lawyer unclear or confused. As we have said, the efforts on his part to befog the issue were largely devoted to giving testimony about collateral and unimportant matters and to self-serving statements. The cited case may well serve as authority to affirm the order of suspension, for in it was the statement that the appellate court should not interfere unless it was clear that the trial court ruled erroneously.

The gist of the remaining question submitted by appellant is the propriety of adjudging him "guilty of subornation of perjury, even though there has been no adjudication of guilt against the alleged perjurers."

In a case of this nature we are not concerned with the application of laws and rules governing the administration of criminal law, but with the question whether the conduct of the attorney rendered him unfit to discharge the responsibilities and perform the duties of an attorney. State v. Finley, 30 Fla. 302, 11 So. 500. Appellant was not convicted of crime, but held, to quote the judgment, "unfit for the trusts and confidence reposed in him as an attorney . . . [and] unfit for association with the fair and honorable members of the legal profession."

The conduct of the appellant outlined in this record is in shocking contrast to standards often set in judicial decisions, and by unanimous opinion of this court as late as 1942 in Lambdin v. State, 150 Fla. 814, 9 So. (2nd) 192. The appellant, we are convinced, deliberately conspired with his client to manufacture testimony by introducing it through a person totally ignorant of the subject, and known by them to be ignorant, of it, thereby designedly misleading, deceiving, and defrauding the court and the adversary in the suit. Such deportment is in sharp contrast to the demeanor expected and demanded of a scrupulous and faithful votary of the law.

Affirmed.

CHAPMAN, C. J., BROWN and SEBRING, JJ., concur.