## STATE v. SHEINER.

Circuit Court, Dade County.

September 8, 1954.

Ellis S. Rubin, Miami, amicus curiae.

George A. Brautigam, state attorney.

Louis M. Jepeway and Jack Kehoe, both of Miami, for respondent.

VINCENT C. GIBLIN, Circuit Judge.

My duty, as I see it, requires that I deprive the respondent, Leo Sheiner, of his license to practice law and of his privilege of serving as an officer of the courts of the state of Florida. He has deliberately refused to dissipate, if he can, the doubt which undeniably exists as to his loyalty to the nation and its constitution, although there is much more than slight factual justification for the doubt; and, because of his silence when the circumstances clamored that he speak, I have been forced to the conclusion that our bench and bar cannot repose in him their trust and confidence and that he has shown himself unworthy of association with the honorable members of the legal profession who are the custodians and guardians of our judicial institutions.

There can be no thorough understanding of the reasoning by which I have been impelled unless there is an adequate appreciation of the purposes, aims and tactics of the communist party, membership in which the respondent has defiantly elected not to disavow.

Widely publicized trials and investigations have exposed communist activities which would still be inconceivable and incredible to the average patriotic American if the facts had not been conclusively established by indisputable evidence; and, at last, many of us are beginning to recognize the menace to our national security and to defend against the danger by our insistence that positions of trust or influence shall not be occupied by persons whose beliefs or conduct create doubt or suspicion as to their loyalty to the republic.

We still have, however, thousands of complacent citizens who, because there are only twenty thousand known members of the communist party in the United States, are confident in the belief that communism provides no threat to our constitutional democracy. Of these apathetic and unaroused Americans who remain oblivious to the danger of communist machinations, it is those who regard themselves as "intellectuals" and advanced libertarians who, perhaps, give the greatest aid and comfort to the enemy. These pygmies on stilts who parade as giants are sometimes found in our institutions of higher learning; and, waving their masters' degrees, they pose as the defenders of personal liberties and as the promoters of international good will. But they only think they think. They prate of "witch-hunting" when conscientious senators and congressmen, knowing much more than they, seek to expose and eradicate disloyalty. They complain piteously of the "methods" employed to combat treason and subversion. They glory in the "courage" of witnesses who, when interrogated concerning sub-

versive activities, invoke the protective provisions of the fifth amendment to stifle the inquiry. They regard as inhuman the execution of the Rosenbergs for their treachery. They question the veracity of the witnesses whose testimony led to the conviction of Hiss for perjury. They applaud the contemptible tactics of the defense lawyers who for nine months taxed the patience of Judge Medina in the trial of the communists who were convicted of violations of the Smith Act. They bemoan the discrediting of Oppenheimer. They would have us use no coercive measures to combat the known determination of the communists to overthrow, by force and violence if necessary, our constitutional government and to establish in its stead a communist dictatorship. They would have us resort only to classroom strategy and to persuasive logic in the effort to convert the Leninists and Stalinists to our way of thinking and thus to deviate them from their plan to undermine and destroy our form of government.

As for me, I place my reliance in the patriotism and common sense of the millions of "average" Americans who, when fully apprised of our exigency, will find no need to depend on the advice of college professors or other theorists in devising effective ways and means of exterminating the vermin gnawing at the foundations of our governmental structure.

To thwart communist tactics it is imperative, of course, that we learn what they are. Fortunately, the alertness and competence of the federal bureau of investigation, the persistence of able congressional committeemen and investigators, the successful prosecution of communists, the untiring diligence of many law enforcement agencies, and the cooperation of some who were communists, but who have renounced their allegiance to the Kremlin, have supplied us with a wealth of information as to communist tactics and methods. It is the obligation of all of us who would preserve our government and our freedoms to study and to learn such tactics and methods so that we shall not any longer be deluded by the cunning and devious strategy of our mortal enemies.

Communists and their sympathizers have found their way into organizations formed to promote world peace, into organizations whose purpose is to better interracial relations, into organizations whose aim is to eliminate religious prejudices, into cultural societies, into student and other youth organizations, into various civic, fraternal and welfare movements, for the purpose of indoctrinating the impressionable, the naive, the irresponsible, the ignorant, and the young "with theories designed to weaken and destroy the foundations of our free society." Pretending to further idealistic and altruistic movements, they have often won the support of many unsuspecting dupes who, happy in the role of public

benefactors, have unwittingly helped the communist agents to disseminate their poisonous propaganda.

We know now that hundreds of communists have wormed their slimy way into key governmental positions in Washington and throughout the country, and that these spies have channeled to Moscow much information and intelligence which we had no desire to share with Russia.

We have learned that hundreds of communist agitators have infiltrated into our labor unions to foment unnecessary strife and discord between management and labor, to promote strikes and walkouts and to cripple industry and minimize our productive capacity.

We have discovered that many communists and fellow travelers have invaded in large numbers the field of journalism, the teaching profession, the ministry, the legal profession, the theatre and the radio and television industry, all of which, of course, are powerful propaganda media.

In fact, we now realize that the corruptive and enervating influence of communist agents is likely to be found anywhere in America because the communist dictators know, as do we, that their hope of world mastery can never be realized so long as the United States shall remain free and strong.

The current trend of American thought, however, affords a basis for optimism. We have awakened and our eyes are opening. Our recognition of Soviet Russia in 1933 and our military alliance with her in the last world war led us to respect and trust her leaders; and, when the struggle, in which we had been engaged for four long years, ended, we relaxed and slept, lulled into a sense of security by our misplaced confidence in our erstwhile ally, only to find, when aroused from our somnolence, that the bolshevik dictators had designs on our life and a knife at our back.

Fortuitously, we have awakened in time to avoid the intended fatal thrust. We have not yet risen in all our might to crush the enemies who would destroy us; but slowly, gradually and surely we are repairing the damage done to our fortress from within. Some of those who did it have been detected and punished; but the search for the others must not end until we shall have secured ourselves against all internal danger, and then we shall be fully prepared to resist all external aggression.

Congress and the legislatures of the several states are enacting needed legislation. The executive branches of our national and state governments are ridding themselves of public officers and

employees whose loyalty is questionable. Labor unions are expelling from their ranks communists and communist sympathizers. Publishers of newspapers and magazines and the owners of radio and television stations are silencing the columnists, writers, commentators and broadcasters who have been writing and voicing communist propaganda. Parent-teachers associations are demanding the resignations of teachers who have brought the ideology of Marx, Engels, Lenin and Stalin into their classrooms. Colleges and universities are realizing the danger incident to the indoctrination of the immature and impressionable student by professors and instructors who follow the communist line. Church congregations are replacing ministers who blend Christianity and socialism. The producers of stage and screen entertainment have felt financially the unpopularity of the Chaplins and Robesons and have profited because of the popularity of the Stewarts and Gables.

What, it may well be asked, is the bench and bar of America doing to rid the legal profession of the adherents of communism?

What I believe should be done is evidenced, I think, by the views I express in this opinion and by the action I have taken in the case at bar. As to what other judges or courts may think and do I can only predict; and my prediction is that they will reason and act as I have should similar circumstances confront them. I am told that my decision is without precedent. I cannot agree. It may be that the factual situation here presented has not been involved in any other adjudicated case; but the principles which in my judgment should govern in the instant case have been enunciated and applied in several prior cases, notably Martin v. Law Society of British Columbia, 3 Dominion Law Reports 173; Cohen v. Wright, 22 Cal. 293; In re Margolis, 269 Pa. 206, 112 Atl. 478; In re Smith, 133 Wash. 145, 233 Pac. 288; In re Taylor, 309 Ky. 388, 217 S. W. 2d 954; In re Keenen, 310 Mass. 166, 37 N. E. 2d 516; and Lambdin v. State (Fla. 1942), 9 So. 2d 192.

If this case merits the attention which has been focused on it and if my decision (announced orally at the trial) is to be properly and fairly evaluated, the facts, as to which there is no dispute, should be known and understood; and I shall state them with meticulous accuracy.

The respondent, on January 26, 1954, appeared as a witness before the grand jury of this court then in session and testified under oath. After he had been asked and had answered several preliminary questions, the state attorney asked him if he had ever been a member of the southern conference for human welfare (allegedly a communist "front" organization); and he declined to answer the question, invoking as one of several bases for his

declination the provisions of the fifth amendment to the federal constitution. He was asked if he had ever been a member of the communist party. The question evoked the same declination and the same grounds for his refusal to respond to the question. Then there was propounded to him the question, "Are you a member of the communist party?" and he answered, "No." In answer to the question, "Do you today belong to a communist-front organization?" he said, "No." But when asked if he had ever belonged to a communist-front organization, he declined to answer, again invoking the fifth amendment. The transcript reflects repeated refusals to answer questions concerning his possible membership and activities in reputedly subversive organizations and his persistent reliance on the fifth amendment.

On March 18, 1954, pursuant to the requirements of a subpoena served on him, the respondent appeared at New Orleans before a sub-committee (of the committee on the judiciary of the United States Senate) which was investigating the administration of the Internal Security Act and other internal security laws; and he was sworn as a witness. He was asked if he had ever been identified in any capacity with the southern conference for human welfare. Again he invoked the fifth amendment. Senator Eastland asked, "Are you now or have you ever been a member of the communist party?" Again he invoked the fifth amendment which accords to a witness the right to refuse to answer a question if his answer would tend to incriminate him. To the question, "Are you a member of the communist party?" his answer was: "I am answering your question, Mr. Eastland, that I am not a member of the communist party." The senator then put this question: "Were you a member of the communist party last year?" The respondent again relied on constitutional grounds in refusing to answer the question, as he did in declining to say whether he had been a member of the communist party five years before the hearing, or six months before. When asked the question, "Three months ago were you a member of the communist party?" the respondent added to his expressed reasons for declining to answer the statement that "you are violating the rights guaranteed to me by the sixth amendment to the United States constitution which provides that I am afforded due process and if any accusation is going to be made against me, sir, then I must be confronted by my accusers." The senator then directed the respondent's attention to the presence in the hearing room of another witness, Paul Crouch, and asked if the respondent knew him. The respondent declined to answer the question. Counsel for the sub-committee interpolated a question. He asked, "Are you a member of an organization dedicated to the forcible overthrow of the government of the United States?" The respondent declined to answer.

Paul Crouch, a consultant of the United States immigration and naturalization service of the department of justice, was then sworn and testified that he had been a member of the communist party for seventeen years, from 1925 until 1942. He detailed his activities as a member of the party before, as he expressed it, he "broke with the communist party after increasing disillusionment over the years." He testified that despite his severance, the party issued him a membership book while he lived in Florida in 1947.

Before Crouch had concluded his testimony, the respondent was again summoned into the room and made to face the witness. Crouch then testified, in the presence and hearing of the respondent, that he knew the respondent in 1947 and 1948 as the head of the southern conference for human welfare for the fourth congressional district; that the respondent had revealed that he was "an important undercover member in the communist party" and was the reserve head of the party for the state of Florida and that should the party be forced underground he was "to be the Florida state secret organizer of the communist party, the head of the party in the state"; that he (Crouch) had met at the home of Charles N. Smolikoff, a communist leader, on Easter Sunday in 1947, with the respondent and others who Smolikoff believed "could be relied upon to carry out communist directives." Crouch named as those present at the meeting, in addition to himself, the respondent, Smolikoff, M. L. Edwards, Phil Sheffsky, Isadore Sapphire (known also as Jack Strong), H. David Prensky and Theresa Kantor. Crouch further testified, in the presence and hearing of the respondent, that the southern conference for human welfare, which the respondent headed in the fourth congressional district, was conceived by the communist party and that the initial organizational steps were directed and financed by the party "which furnished several thousand dollars of cash to Joseph S. Gelders for his preliminary expenses until he was able to raise sufficient funds from people, from intellectuals, and people who did not know the nature and purpose of the organization." "The purpose of the communist party in setting up the southern conference for human welfare," Crouch testified, "was to have a mass organization through which the communist line could extend all over the south, through which intellectuals, professionals, even ministers, could be brought within the scope of the communist party influence to enable the communists to gain entry into the government. . . . It was a vehicle to promote communism. It was intended to lead to class hatred, to race hatred, dividing class against class and race against race as its real objectives in spite of the words put on paper, some of them by myself."

After Crouch had concluded his testimony, Senator Eastland addressed the respondent and said, "Mr. Sheiner, you have heard an accusation. You have been accused of telling Mr. Crouch that you were a member of the communist party. I ask you, sir, are those statements of Mr. Crouch relative to you true or false?" The respondent refused to answer the question, relying again on the frequently reiterated constitutional grounds. The senator then remarked: "Mr. Sheiner, I think that if a man accused me in an open hearing of being a communist, unless I were guilty, I would be glad to answer it. I think any patriotic American, any loyal American, any man who loved his country, if accused of belonging to an organization that is traitorous to his country, an organization that affiliated with a power abroad that has killed and maimed thousands and thousands of American boys, if I were accused of belonging to that organization, and I were not guilty I certainly would not slink behind the fifth amendment." The respondent still remained silent except to assert his constitutional rights.

Before the respondent was released he was asked if he had been a member of the communist party one month before the hearing, or one week before, or the day before. The inquiries elicited again the same refusals and the same assignment of reasons.

The recited facts were made known to me by Ellis Rubin, a young member of the bar of this court, in whose integrity I have the utmost confidence. Considering the conduct of the respondent as reprehensible and morally indefensible and as a violation of the honor of the legal profession, Mr. Rubin presented to me a verified suggestion that I take appropriate disciplinary action against the respondent pursuant to the provisions of section 454.24, Florida Statutes 1953.

A consideration of the facts to which my attention was drawn prompted me to direct the state attorney, George A. Brautigam, to make in writing a motion, in the name of the state, for the disbarment of the respondent. The able state attorney acted with dispatch and the motion was promptly filed.

The respondent demurred to the motion, contending that the facts alleged, even if proved, do not warrant disbarment or any other disciplinary action. In my order overruling the demurrer, I expressed my opinion that the motion required "the respondent's answer and explanation." By the order the respondent was required to file his answer *under oath*. The governing statute, section 454.25, Florida Statutes, 1953, requires a sworn answer.

The respondent's answer, when filed, was not under oath, although there was appended to it a notary's certificate that the respondent had sworn before her that "the matters and things therein

stated and set forth are, to the best of his knowledge, information, recollection and belief, true." The diligent state attorney subpoenaed the notary to appear before him and her sworn testimony revealed that the answer had not in fact been verified by the oath of the respondent. The state attorney moved for a summary judgment of disbarment. At the hearing on the motion I privileged the respondent to verify the answer before me and he swore that "the facts averred in the . . . answer are true." The motion for summary judgment was then denied.

In the motion for disbarment it was alleged that the respondent is or has been a member of the communist party of the United States, the southern conference for human welfare and other organizations which "advocate and teach the forceful overthrow of the constitutional form of government of the United States of America." In response to such accusation the respondent answered that he "does not believe in the advocating or teaching the forceful overthrow of the constitutional form of government of the United States of America."

The evasiveness of the response may not have been intended, but nevertheless is apparent. Obviously one may personally disapprove of the advocacy of the forcible overthrow of our government and yet belong to a party or organization which he knows does advocate such action. It will be noted too that the respondent does not swear that he does not believe in the employment of force to effect the overthrow of our government. He says that he does not believe in "advocating or teaching" that force be resorted to in the effort to overthrow the government. To advocate or teach is to communicate openly to others the thoughts and views of the advocate or teacher in the effort to induce the listener or reader to agree with such thoughts and views. I presume that none of the communists in the United States would dare attempt to convert the unconverted to their way of thinking by open discussion. They are covert conspirators who meet and plot with trusted fellows of the same ilk.

Other than his disavowal of his personal belief in the advocacy or teaching of the doctrine of force, there was no denial in the respondent's answer to the allegation that he is or was a member of the communist party, the southern conference for human welfare and the other organizations or groups named in the motion for disbarment. He said that he "neither admits nor denies" the allegation and demanded that the movant produce "strict and exact proof" in support of the charge. He advanced in his answer the contention that to require him to "further answer" the allegation would "deprive him of the rights, privileges and immunities" guaranteed to him by the fifth amendment and other constitutional provisions.

There existed, I think, an adequate legal basis for the entry of a summary judgment of disbarment when the respondent did not file, within the time specified in my order, an answer under oath, but filed an answer to which there was appended a false jurat. The manifest evasiveness, duplicity and insufficiency of the answer justified, I believe, the summary disposition of the case by the entry of a judgment of disbarment. I preferred, however, to obviate the likelihood that prejudiced or unthinking critics would vociferously charge that the respondent had been disbarred on a "technicality" without a hearing. And there was another cogent reason for according to the respondent a trial on the merits. I was hopeful that he would—and I earnestly prayed that he would—explain and justify his conduct which has engendered in the minds of all fair and intelligent persons familiar with the facts a substantial and justifiable doubt as to his allegiance and loyalty to our country; and that, if it should be shown that he had joined the communist party, it would be further shown that he had renounced the communist philosophy and is now a loyal and true American.

My hope, however, was in vain. When, at the trial, I directed to him from the bench the question, "Have you ever been a member of the communist party?" and again when I asked, "Are you now a member of the communist party?" he scurried behind the fifth amendment, just as he had done when he was before the grand jury in January and when he was before the senate subcommittee in March. In a court of justice of which he is an officer, he arrogantly and defiantly fended against an inquiry into his possible communist affiliations and subversive activities. When he refused to answer my questions I immediately announced my intention to enter a judgment of disbarment. The announcement produced no change in the respondent's attitude.

Repeatedly since the trial I have consulted my conscience, as well as my judgment, for the answer to the question of whether I have done right or wrong; and each time the answer has been one of approbation. The reason, I am sure, is that I have concluded that, by his exercise, for his own individual and personal protection, of the right, guaranteed to him by the constitution, to refrain from giving testimony which would incriminate or tend to incriminate him, the respondent violated his paramount duty to the nation, forfeited his claim to public confidence and proved himself unfit for association with the honorable members of the legal profession. He entered the courtroom possessed of a right, the right to protect himself from self-incrimination, and a privilege, the privilege to practice law. The right was not denied him. He was not required to give evidence against himself. No words fell from his

lips in the courtroom which may be used against him in any criminal prosecution. He emerged from the courtroom with the right accorded him by the fifth amendment unimpaired. But he left divested of the privilege to practice law. He was stripped of his lawyer's license, "that badge of character, integrity and honor for which the profession of law must ever stand to sustain its position as an arm of our judiciary." It was taken from him because his conduct—particularly his silence when, in his presence and hearing, a witness testified as to his disloyalty and perfidy—demonstrated his unwillingness to dispel the aura of suspicion and doubt in which he stands and in which he has chosen to remain. How can he possibly assert any claim to our trust or respect? We are justified in regarding him as either a public enemy or a coward. He has protected himself by invoking the fifth amendment. We shall protect ourselves by invoking the state's right to withdraw from him the privilege which he has abused. ·

Accordingly, the license or permit of the respondent, Leo Sheiner, to practice law in the Supreme Court of Florida and all other courts of the state of Florida is revoked; the certificate evidencing the granting to him of the privilege to practice law in such courts is cancelled; the striking of his name from the roll of attorneys privileged to practice law in such courts is authorized and directed; and he shall no longer have, enjoy or exercise any of the rights and privileges heretofore accorded him, as an attorney and counselor at law, by the state of Florida.